Today is 19-305-88 Christopher Verdin v. Charles Cook et al. Mr. Berman, whenever you're ready. Ben Berman May it please the court, my name is Ben Berman and I represent the plaintiff in this matter, Mr. Christopher Verdin. This is an appeal from a granting of summary judgment in favor of the defendant officers against my client, Mr. Verdin. And the primary reason for the granting of summary judgment was a paucity of case law that was cited in opposition to the summary judgment. Of course, this matter is now in de novo review and I have plenty of case law to present to you now. In a way, did you represent Mr. Verdin at the summary judgment proceeding? We did in conjunction with another firm. I would present to your honor that our firm did not do any of the work on the summary judgment proceedings, but we did represent him at the time. I've just never heard a lawyer get up and say, you know, the lawyer that represented him at the summary judgment hearing dropped the ball. But I guess any ship in a storm. Mostly I want to make it clear that the reason for the granting of summary judgment was not that we'd already presented this case law and that the district court found it disagreeable, but rather that this case law wasn't presented at that time. I guess you're almost waiving your challenge to the summary judgment. Well, I'll proceed with the case law now. All right. Well, to emphasize that point, sure, when you say paucity of case law given to the district court, I thought the district court said there was no case law submitted in connection at least with the first allegation of excessive force. There were one or two cases cited, but nothing on point. If that answers your question, your honor. So what's right on point that a police officer who's told by the mother of a young man that he's got a gun can't use force to the extent that was used here, putting a knee in the back as you are trying to arrest an individual? What's the case that says that would be inappropriate? First, the best case is Kern v. Elishire. I'd like to just walk through this case a little bit. In Kern v. Elishire- Now, remind me, that is in your brief, correct? Yes, your honor. And that is from 2015 Fifth Circuit law. In Kern v. Elishire, this involved a student who was at school, got into a scuffle with a police officer who was on duty at the school. There are two instances of force at play in Kern. First, the officer – well, there's a disagreement about the exact facts. Of course, the plaintiff and the officer have slightly differing tales of what happened. But what's nondisputed is that the officer was reaching for the student's ID, and the student at least pulled back, and the officer claims that she resisted him and pushed him away or swiped at him. And the officer then pushed the student up against the wall. That's the first instance. Well, I'm reading from the case. Correct me if I'm wrong. Yes. It was slamming a student's head into the wall after her resistance had ceased. It was a violation of clearly established law. Is that current? That's current. Okay. So would you agree that the facts – I mean, maybe you don't agree. The facts here are – where's the – is there slamming of the head? Is that a fact here? There is a – well, there's two instances in this case, in Verdon, of force. Well, force, but knee in the back during an arrest of somebody who had – That's the first instance. And then the second instance is when Mr. Verdon – and this is crucial – was already handcuffed in the back of the police vehicle, and then for no police purpose was yanked out of the vehicle and pushed against the vehicle. You know we've watched the videos. Yes, Your Honor. And he's – I can't even agree that the officer even put his knee in the back. He told him to get on the ground. Looked to me like the officer was kneeling beside him. I do know how courteous the officer was to him the entire time he was handcuffing him. I would respond, Your Honor, that the district court judge noted in his order and reasons that – Well, this is de novo review. We don't – we're not bound by that opinion. For a factual matter. We're not bound by – there are no factual matters in summary judgment. It's a question of law, genuine dispute of material fact. It's not even – it's arguable he even had his knee in his back. And the second incident where he pulled him out by his elbow, there wasn't any slamming, at least shown on the video. There was a – I would submit there was a push in the – more importantly, the plaintiff, his version of the event is that he was pushed and hit the vehicle. Would you agree with – well, tell me if you agree that when there's video evidence that the court can review under the Scott case from the U.S. Supreme Court, I mean we can – if we see it, I mean we can rely on it, even in summary judgment. Yes, Your Honor. And I believe that the Scott case represents that, of course, the panel is allowed to rely on the video. However, unless – if the video is not conclusive – Well, why wouldn't it be conclusive? I mean what is the video not showing with respect to the force here? Well, I would say the video shows the – certainly shows the plaintiff being yanked out of the vehicle and being – I would say unclear whether he actually is pushed and hits the vehicle. Well, I guess my question was where is the video inconclusive? Like I can imagine some other case maybe where the video doesn't show some material part of the incident, but – Well, I guess – let me just step back and I think we're talking about the second – because I guess there's two videos. Well, either one. There's the first video of the first arrest, and then there's the video of Mr. Verdin being yanked from the vehicle. So – Is there anything in either one of those videos that is inconclusive with respect to the nature of the force used? I would represent that the first video, the video of the initial arrest, is inconclusive as to the force of the knee being applied to Mr. Verdin's back, and that the second video is inconclusive regarding Mr. Verdin hitting the vehicle when being pushed. But if the knee was used at all – Yes. It was as he's being cuffed, correct? It wasn't after he'd been immobilized. Mr. Verdin's testimony is that the knee was after he'd already been handcuffed and his arms were already behind his back. And the video is inconclusive as to these – While the officer is searching for the weapon? After the weapon had already been – What struck me about the arrest was how courteous the officer was to your client and how cooperative your client was to the officer. I was struck by the professionalism by the officer and your client's willingness to cooperate with the officer. He said, the gun's in my pocket, I've got some money or whatever. I mean, it was remarkable in the sense that it was so cooperative on both sides. And I would submit that the fact that my client was cooperating and that the officers themselves admit that he was fully cooperative goes directly to the Graham factors that because he was cooperative, he was not attempting to flee, he was not a danger to himself, he was not a danger to others, he was not a danger to the police officers. Well, now, you're not saying the officer can't put a knee on his back while he's trying to handcuff him. You're saying – you said there was excessive force with the knee, and again, it's not even visible that he even used his knee, but assuming he did, there was certainly no exhibition by your client of any stress or pressure or discomfort or anything else. The knee in the back coming after he'd already been handcuffed, I would submit the case law shows would be excessive force because at that point he's been subdued, he's not a danger to anybody, he's making no attempt to flee, and at that point he's – there's no need for any force to be applied to him. You're saying that the fact – the knee qua knee, just the fact that he used his knee is excessive force. Well, I would add to that it's not just the knee. It's the knee after his – after the firearm has been removed from him, after he has been handcuffed, after he's been fully cooperative, and after he's shown to the officers that he's making no attempt to flee, that he's no danger to anybody. I would add also on the third gram factor, I'm not sure that it militates very heavily in favor of my client, but this was not – this was not a highly serious charge. I'm not saying it was completely de minimis like a traffic charge. Well, the police surely can take into account in using force to make an arrest what the defendant was doing before, what led to the altercation. And here I'm hopefully – I assume you would agree that we have dangerous behavior by the defendant leading up to the arrest. Wouldn't you agree with that? I would agree with that, Your Honor. And in terms of – well, I guess I would say that there's – of course my client denies that he was really doing anything dangerous, but at least under the police officer's understanding, I will grant you that they had right to at least fear that there had been – Well, the mother calls 911. Right. And says he has shot near my daughter, shot at her dog. It was shot near the dog. Okay. And he – and Mr. Vernon denies that that's – Did the mother also report that he said, now I'm leaving to go find meth? Did the officers know that there was drugs in the picture or not? I'm not sure the answer to that, Your Honor. All of that is – even granting that the officers, you know, believe that there was a dangerous situation at hand, Curran is right on point on this. What kind of weapon did he have? I know it was a handgun. I couldn't tell you more specifically than that. Didn't you see the weapon on the video? I'm not – I don't know much about firearms. Didn't you hear the officer describe the weapon when he called it in to headquarters? Yes. I know the officers were aware of the firearm. I'm just not sure what type. I just know it was a handgun. When you say Curran is right on point, did the student, the female student, have a firearm? Was that what the police were responding to? No, but the part of Curran that I'm – that I mean is directly on point is that the court in Curran was discussing how the calculus of excessive force changes once the suspect has been subdued and is no longer a danger to others, a danger to himself, a danger to the police, and is no longer trying to flee. You know, in this – again, in this video, the officer in the vehicle tells him, get down on the ground. The man drops to the ground instantly. The officer goes up, handcuffs him, says, where's the pistol he – weapon he tells him. Then he tells him, I've got this, that, and the other. Then the officer says, here, let me help you up. Bend over. You know, get on your knees so I can lift you up. There was – there was no improper action, at least on the video, towards the defendant. Just the opposite. He could not have been nicer to him. Excuse me. I guess on that point I would just submit that this is a question of fact as to whether the officer did put his knees into our client's – Maybe you want to talk about him getting yanked out of the car. I would prefer – Because the niceness appears to have dissolved by that point. I would prefer to talk about that. There was no longer polite language being used. I would prefer to talk about that in a second instance, which I think that alone should warrant a reversal here. And so in Curran, they talk about how the – Please stop talking about Curran. Just tell us about why you think there was – Okay. Why the officer is not entitled to qualified immunity based on the facts. Because the client, Mr. Verdin, was already in the back of the squad vehicle. He's handcuffed. There's no reasonable way to say that he is attempting to flee, that he's a danger to anybody else, that he's a danger to himself, or that he's a danger to the officer. But even if he's not a danger, the police can say, get out of the vehicle. And I thought the video was clear that he refused to get out. At that point, you're saying they can't yank him out? That's correct, Your Honor. In multiple cases, the Fifth Circuit has stated that even if a suspect at first refuses to exit a vehicle, the proper course of action is to not resort immediately to force but to try negotiation, to try talking. And there's been multiple cases, DeVille v. Marcantel, 2009 Fifth Circuit case. Similar instance, a woman is stopped for a traffic stop. She's not handcuffed. She could drive a vehicle away. And the police officer orders her to get out of the vehicle. She says she refuses until her husband comes to get her child. Now, wait. She wasn't in a police vehicle. That's correct. She was in her own vehicle. And I would submit that that's even... You don't see a difference? I do see a difference. And I would submit that that militates even stronger in favor of Mr. Burton here because... Well, let's say the police take the individual they're arresting down to the police station. And then they say, get out. He can't. They don't have to beg him to get out. If he says, I don't want to get out, they can pull him out. They don't have to beg him to get out. But DeVille v. Marcantel and we've... There's Newman v. Guidry as well, another Fifth Circuit case. There is... Let's see. Martinez Aguero v. Gonzalez. All of these cases show that even though... Even if the officer asks the person to get out of the vehicle and they do not get out of the vehicle immediately, that there should be... They shouldn't immediately... It looks like I'm out of time. No, go ahead and finish your sentence. That they should not immediately resort to force and that that is excessive. And that's precisely what they held in DeVille v. This court held in DeVille v. Marcantel is excessive force to immediately resort to force just because the person does not immediately get out of the vehicle. Thank you, counsel. Thank you. Mr. Hanna. Good morning, Your Honors. Mark Hanna here on behalf of Deputies Cook and Seehan. May it please the Court, Your Honors. The trial court was correct in granting summary judgment in this case. The plaintiff should not be allowed to re-argue the case with the new authority cited. And the plaintiff just admitted earlier that they... Now, wait a minute. You're not suggesting that if a case on point comes down between summary judgment and oral argument, a lawyer is precluded from relying on that case. Well, what I would say is that the case law is very clear that in the Fifth Circuit, it is the plaintiff's burden to rebut the defense of qualified immunity with clearly established law. In the Vann case that we cited to makes it abundantly clear that in the district court, if the plaintiff does not cite to preexisting or presidential case law, that that dooms his case. And that's precisely what happened here. Now, he cited to Elder, and Elder talks about it. I think, and I could certainly be wrong, but I believe the Supreme Court has held that we look at the law up to and including when we're hearing the case. But I think that's a Johnson case. I could certainly be wrong. Sure, but it has to be of precedential value. Well, okay. It has to be a case that makes it clear as to what the law is, such that every reasonable officer would understand and know what it is. It's got to be. And oftentimes in the jurisprudence on qualified immunity, they talk about a body of case law, a body of law that establishes what the parameters are of qualified immunity. We have a pretty established body of law that once an arrestee is cuffed and immobilized, then additional force can be problematic and can be violative of the Fourth Amendment. Do you accept his description of the video in terms of the chronology, gun removed, cuffs on, then the alleged knee to the back? Is that at least just the timeline that the video shows? Judge Lamell pointed out that the video of the arrest on the side of the road took no more than two minutes. I would suggest to you that despite the suggestion that there might be an opportunity for a knee in the back, I agree with you, Judge Barksdale, it simply isn't evident in the video. In fact, the video shows that Deputy Seehan rocks the body back and forth from left to right during the course of searching him. How could he do that if he had his knee in his back? It's simply not factually possible. And there is at most, in Judge Lamell's view, a brief snippet in time in that two minutes where maybe you can't see whether or not there is a knee placed somewhere on the body of Mr. Verdon. But I suggest to you that if you look at the totality of the video, there's not that brief two, three-second period of time that may be missing in which you would even suspect that a knee was in the back. It's just not there. Well, let's assume there is a knee in the back at some point during the arrest. Where is the clearly established law that says that putting a knee in the back of arresting somebody who has been shooting with a handgun is excessive force? Where is that case? Judge Lamell pointed out that plaintiffs did not cite to a case, and I don't think they did. I saw a case cited about putting your knee on somebody's neck when you're arresting them, and that seems to me to be materially different than what we have here. Yes. The Alexander case, the plaintiff cited to Alexander was pinned down, faced down by three officers. He had a boot and knee pressed to his neck. His face was mashed into the concrete. Three officers were manipulating his limbs, putting pressure on his torso, neck, and head. And it's of interest that the court said that perhaps his refusal to exit the vehicle warranted removal. So that's a sidelight to that case. I think of these cases as a notice issue where the officer is put on notice that certain conduct crosses the line. And so if that case that you just read to me, the officer read that case and knows that that behavior crosses the Fourth Amendment excessive force line, but I fail to see how that would put this officer on notice that what he did crosses the line. I couldn't agree more. I think it's factually distinguishable from the facts of this case. I mean, at most, if we give the plaintiff the greatest benefit of the doubt with regard to the knee, the knee would have been momentarily placed on the back. It's not evident in the video, but momentarily placed on the back. He exhibits no discomfort. He doesn't shout out. There's audio and video, okay? He doesn't suggest, hey, why are you putting your knee on my back? That hurts. Nothing like that whatsoever. We're now moving to the second incident because Judge Junkin's right. Things did deteriorate. Instead of taking him to the police station, they take him back to the home. Yes. And then there's jeering and taunting once they pull him out of the car. So is your position just strictly we focus solely on the issue of force and the only force was the removal from the car, and therefore the jeering and taunting has nothing to do with the Fourth Amendment analysis? Is that your argument? Well, certainly you have to look to the objective facts and the state of mind or the intent. Cases talk about that the evil intent of the officers should not be considered, even if it's suggested that there might be some. Because, I mean, if we're looking at the record from the point of view of the non-movement, I guess we have to assume that the officers wanted to scare him, right? We don't know. No, and really the case law suggested that we shouldn't dive into that pool to try to figure out what the intent is. What were they trying to do? We look at the objective facts, and his conduct has deteriorated to the point where it's his conduct. It's his conduct that resulted in him being removed from the vehicle. I mean, you all saw the transcript. Could you stop for a minute?  Why do they drive to his home and then tell him to get out of the police vehicle? I saw some reference to because they needed to put him in a different vehicle. But I think the video is undisputed that they wanted to then egg him on and jeer him. Are you saying that that's not correct? We don't know what the actual motives were of the deputies. No, wait a minute. I think there's record evidence that Officer Sheehan said I wanted to intimidate him. Is that correct? There is attached to the deposition the internal affairs investigation, and there's no doubt about that. But don't we go back to the objective facts, not the state of mind or the intent of the officers? And I won't dispute, Judge Barstow, that there is evidence in the record to suggest what they were trying to accomplish in addition to taking hold of the situation, getting him to change his conduct, and admittedly, eventually transferring him to Cook's vehicle because Cook was the arresting deputy, and pursuant to the procedure, the arresting deputy is ultimately to bring the suspect back in. And they did say that at the end of the day, that's what they intended to do, was put him in Cook's vehicle and take him back. I would think your argument would be that none of this stuff we're talking about is material to the excessive force. Well, that's what I'm trying to say insofar as trying to get away from it. The way I said it, we don't really care whether the officer – I mean, look, I'm looking at the record evidence right here. The officers got ticked off at this guy. They wanted to scare him. They thought he was being belligerent towards them. None of that sounds good to me. But the question is, is that material to the excessive force such that who cares? That's what I'm trying to express, is that the Fifth Circuit jurisprudence says, you know, we can't take a deep dive into intent or state of mind of the officers. We've got to look at the objective facts. And the objective facts are reflected in the transcript that was attached to their opposition to the summary judgment of the conversation that's captured on video. And you can tell that Verdon has just completely lost it. He is combative. He's threatening. He's using all sorts of just inflammatory language with these law enforcement officers. Well, so is the law enforcement officers. And so they had a right to make him get out of the vehicle after he refused three commands. They asked him three times, get out, get out. And we can't take a deep dive into exactly what their purpose was in asking him to get out, their state of mind. Rather, the objective fact that they asked him to get out three times, and he refused to comply. And then they used a minimal amount of force to remove him from the vehicle. You heard counsel emphasize DeVille. Could you speak to that case and distinguish the DeVille case? That's the one where the police yanked the woman out of the vehicle, and we reversed the district court statement, qualified immunity. So was that roughly analogous? No. I had one. That's all right. According to DeVille, she was pulled out through the vehicle. The officers did not hit her, although they threw her up against the vehicle, resulting in a blow to her abdomen. She fell to the ground on the way to the crews, complaining of pain in her abdomen. I think they're saying that she refused to get out. They yanked her out. And our court said, well, then there's a dispute of fact. Can you just yank a driver out? So is the difference the police vehicle versus personal? Is it the type of offense they were responding to? Well, yeah. I think that they were just having conversation with the plaintiff in the DeVille case, and that makes it distinguishable from this case in which the guy was under arrest. He was handcuffed, but he was engaging in combative behavior and frustrating the conversation with the officer to the point where they just felt like they had to take him out. He was completely uncooperative in that circumstance, and there's evidence that he was making physical manifestations towards the officer like he wanted to hit him. Yeah, but he was cuffed at the time. I know, but if you look at the transcript that they provided in opposition to summary judgment. We're assessing at the time of force, the forces they yank out. The evidence you're referring to is once he's already out. So we really don't know what the provocation was. They're presumably driving him to the police station to book him. Then they stop. They detour stop and yank him out. And so what you're telling us now about all this provocative, dangerous, threatening behavior towards police, that actually exists nowhere, correct? No, Judge Hickinson, I have to disagree. The transcript indicates that he was making threatening gestures while he was in the vehicle before they took him out. Okay. And you stole my thunder in questioning of counsel because I was going to say the exact same thing that you said, which is police take arrested suspects to lockups, to detention centers, to police precincts all the time. And this can't be the first instance in which an arrestee said, I'm not getting out. I'm not getting out. Uncooperative. Officer has every right to say to an arrestee, get out. I know, but obviously I ask that to opposing counsel. I suppose if police officers drive you far into a forest instead of the police station where you would expect to be getting out, it might be different. I might not want to get out of the vehicle if all of a sudden I end up in the middle of a forest with the police officer. I would say no. So it isn't exactly the same as refusing to get out when you're at the police station. When they detour and go somewhere else, it might well be a person who's already been cuffed and is arrested would think, why am I being asked to get out here? But even if that happened and it was all on body cam and they use a reasonable, minimal amount of force to remove him from the vehicle, and it's all captured on body cam, even if you're out in the forest, then what's the deprivation of the constitutional right at that point? And let me also suggest this. You know, there was some suggestion that, well, they took him out of the vehicle and they used a minimal amount of force to remove him from the vehicle. Okay? Objectively reasonable under the circumstances. No clearly established law offered by plaintiff to suggest that you can't do that. Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chamber, violates the Fourth Amendment. Graham teaches us that. And Judge Barksdale, as you mentioned, everything's on the video. Fifth Circuit jurisprudence has made it very clear. I think it's the Carnaby case. It says, look, those are the facts. Plaintiff can't create new facts outside of what's on that video. They asked him three times to get out of the vehicle. He refused the command. They used a minimal amount of force to remove him from the vehicle. They didn't throw him to the ground. They didn't kick him. They didn't slam him. They didn't do anything to him to hurt him. They stood him up. And to the extent that there may have been any push or shove, he wasn't shoved or pushed against a police vehicle. They often spit the cuffs off and fight him hand-to-hand, right? It never happened, no. I know, but if it had happened and then they'd beaten him up, would we be here with a pretty powerful excessive force case? We wouldn't be here if that had happened. I don't disagree with you. So it was good for him to not agree to take the cuffs off. They were off for 60 seconds or less. They put him back on, took him to Cook's car, and that was the end of it, and he never got hurt. Thank you. Good morning, Your Honors. I'm Richard McCormick. I'm hoarse. I'm suffering from a chest cold, but I want to object to the use of the word they in the briefs. The brief of the plaintiff always referred to the officers. In argument, he said they did this, they did that. That's wrong. The sheriff wasn't there. Deputy Gilbo was there. He was a trainee. He had no authority to do anything other than stand there and watch what was playing out. There's no evidence in the record of any policy that the sheriff promulgated, any policy that was violated. There's nothing here to support a verdict against my clients. And you all touched on this. Even in arguing here today, the use of the word they just gets thrown around and puts my people in with these two officers, and I'm not saying the officers did anything wrong. I don't think they did anything wrong at all. I don't think there was any unconstitutional excessive force here. However, if you look at my two clients, the sheriff and the deputy, there's nothing. There's nothing in the record upon which to find them liable whatsoever. Do your honors have any questions? I don't think so. Thank you very much. Thank you, counsel. Counsel, do you agree with what Mr. McCormick just said, that putting to one side what the arresting officers did, Mr. Gilbo and Mr. Larpenter, just there's nothing there with respect to them? I would agree that this is about Officers Seehan and Officers Cook. So you agree to there being the sheriff and Gilbo being dismissed? I have no argument against it right now, no. So I guess yes, to answer you. Thank you very much. In my remaining time, first I want to note for your honor, Judge Barksdale, you had noted that there was a Supreme Court case that gives this panel the power to review all of the relevant case law. And I just want to note that that's the Elder v. Holloway case, the Supreme Court, in which they stated that a court engaging in review of a qualified immunity judgment should use its full knowledge of its own and other relevant precedents as opposed to not reviewing applicable precedent if it was not cited at the district court level. I mean, I don't see any reason to dispute that, of course, but you would agree that the clearly established law has to be established as of the time of the conduct. Absolutely would agree with that. And all of the cases that I've discussed today are prior to the arrest, in fact, in most cases, years before. Right. Second, there is absolutely record evidence to show that there was no police purpose in taking Mr. Verton out of the police vehicle. What case can you point us to that says that that is a material fact here, the purpose of the officers in asking him to get out of the vehicle? I think it goes to the Graham factors, which are that, particularly the second and third, namely that Mr. Verton was no danger to himself, to others, was no danger to the police, and was not attempting to flee. Well, I was talking about the purpose of the police. Right. The idea here is that, well, they didn't have any good reason to ask him to get out of the car. This is Judge Higginson's. They drive you to a forest and they ominously say, okay, get out of the car. And I think the importance of that is that judging excessive force is supposed to be a calculus, a balancing act of, if the officers need to use force for a purpose under the Graham factors, then they're allowed to use more force. If there is no reason for the force whatsoever, then even a small amount of force should qualify as excessive. And this is precisely a case where there is absolutely no reason for force whatsoever. Isn't there evidence that, consistent with what we heard, that they were removing him from Sheehan's vehicle so that he could be placed in Cook's vehicle? Well, Cook himself, this is in record evidence, Officer Cook himself stated that he agreed that there was no evidence to support taking the handcuffs off of him. That wasn't my question. My question was, he was moved from Vehicle 1 to Vehicle 2. That's why they had to get him out of Vehicle 1. Is there evidence of that fact? Was he put in Cook's vehicle? I'm not sure if he was eventually put in Cook's vehicle. I will grant that, since I can't say one way or the other, I'll grant that that's the case. Was there any evidence in the record that that's standard operating procedure, that the arresting officer brings the arrestee to the police headquarters? I believe that's in the record evidence, but there's also in the record evidence both officers stating that there was no reason, that basically they could have taken him immediately to the jail. Sheehan himself admitted that they had enough reason at that point, they had the power to bring him to the jail, and that they did not need to bring him back to the mother's house. In fact, the only reason they drove back to the mother's house was to basically continue the investigation, I think to talk to the mother. It is on the video. They're talking to her on the video. Right, but that he could have brought him back to the jail, and that the purpose in taking him there and asking him to get out, it wasn't so much to do this transfer, but instead they just pulled him out because they wanted to intimidate him, and they basically admitted to that in the record evidence. I just want to close because I only have a few seconds left. The Alexander case, because I know it's sort of a sticking point, the severity of the force, I just want to close by stating that the Alexander v. City of Round Rock case shows that even insignificant injuries, as long as they're there, because of the Graham factors, if there's no attempt to flee, then even a small amount of force is excessive. What is the record evidence of injury to him from being removed from the car? There's record evidence of him having back, shoulder, neck problems and complaints of pain and psychological injury as well. Thank you, counsel. Thank you, Your Honor.